## SUPREME COURT.

JOSEPH BRITTON and others agt. THE MAYOR, ALDERMEN and
COMONALTY of the city of New York.

The charter of the city of New York confers upon the *common council* many powers
and privileges that belong to them in common with private companies or individ-
ual citizens, which they hold and enjoy in the capacity of a *private corporation*.

Thus they are declared to be able in law, and capable of suing and being sued, &c.,
in-as full and ample a manner as any citizen; and shall be persons capable and
able in law of purchasing, holding and disposing of real and personal property,
in such manner as to them shall seem meet and proper.

The charter also confers upon them the ferry franchises all round the island, and all
the fees and perquisites thereto appertaining; and also the ground between high
and low water mark, within a given distance on Long Island, and all the waste
unpatented and unappropriated land within the limits of the city, together with
the rights of dockage and wharfage, and all rents, issues and profits arising or
growing out of the same; and also all the rivers, creeks, coves, ponds, &c., fishing,
fowling, hunting, &c., and all mines, minerals, &c., within the limits of the city.

These grants, with many others, constitute a large mass of *private rights and
interests*, in various descriptions of property, real and personal, corporeal and
incorporeal, held and enjoyed by the city in the same way and in common with
any citizen upon whom like property and franchises might have been conferred.

The charter also embraces an extensive grant of *political* power, legislative, ex-
ecutive and judicial, which, so far as granted, represent these great departments
of the state government, and which are lodged with the common council in their
capacity as a *municipal corporation*. The legislative power is *conferred* upon
the common council.

The powers of the common council brought into exercise, in forming and entering
into *covenants and stipulations*, providing for *cleaning the streets, public
wharves and piers* of the city, and sweeping the same, belong to and are part
and parcel of its *legislative and executive* authority.

It is not competent for the common council to *tie up and embarrass* the execution
of their public duties, whether legislative or executive, by *contract or otherwise*.
In other words, it is not in its power to bind its legislative capacities by any pri-
vate arrangements or stipulations, so as to disable itself from enacting any law
that might be deemed essential for the public good. Therefore, they have no
power to limit their *legislative discretion by covenant,* (in reference to clean-
ing streets, &c.,) and they are not *estopped* from giving that answer.

*General Term*, 1843.

*Before* SAMUEL NELSON, Ch. J., GREENE C. BRONSON and
ESEK COWEN, *Justices.*

THIS was an action brought to recover the compensation
provided by a contract made in March or April, 1843, by

the common council, in relation to cleaning the streets of
the city.   To this complaint the defendants interposed a
demurrer, on the ground of their non-liability under such
contract.

P. A. COWDREY, *for defendants.*
SAMUEL A. FOOT and PRESCOTT HALL, *for plaintiffs.*

By the court, NELSON, Ch. J.   The charter of the city of
New York confers upon the defendants many powers and
privileges that belong to them in common with private com-
panies or individual citizens, which they hold and enjoy in
the capacity of a private corporation.   Thus they are de-
clared to be able in law, and capable to sue and be sued,
implead and be impleaded, &c., in all manner of actions,
suits, complaints, pleas, causes, &c., in as full and ample a
manner as any citizen; and shall be persons capable and
able in law to purchase and hold messuages, houses, build-
ings, lands and tenements, in fee, or for life or years, or in
any other manner; and, also, goods and chattels, and all
other things of what kind or quality soever; and shall and
may give, grant, demise, assign, sell, or otherwise dispose
of the same as to them shall seem meet and proper.

The charter also conferred upon them the ferries on both
sides of the East river, and all others then or thereafter to
be erected, and established all round the island, and all
fees and perquisites appertaining and belonging thereto;
also, all the ground between high and low water mark
within a given distance on Long Island, and all the waste
unpatented and unappropriated land within the limits of
the city, together with the rights of dockage, wharfage,
and all rents, issues and profits arising or growing out of
the same; also, all rivers, creeks, coves, ponds, &c., fishing,
fowling, hunting, &c., and all mines, minerals, &c., within
the limits of the city.

These grants, and many others that might be enumerated,
constitute a large mass of private rights and interests, in

various descriptions of property, real and personal, corporeal and incorporeal, held and enjoyed by the city in the same way, and in common with any citizen upon whom like property and franchises might have been conferred; and within the limit of the grant the defendants may deal with the property, in their management and disposition of the same, in any way that would be lawful for an individual owner; and any contracts or engagements entered into in the course of such management and disposition, would be as obligatory upon them as upon an individual.

We had occasion to examine this subject more at large in the case of *Baily* agt. *The Mayor, &c.*, (3 *Hill*, 531,) in which case we held that the grant of the legislature authorizing the city to furnish the inhabitants with pure and wholesome water, by means of the Croton aqueduct, was the grant of a special private franchise, made as well for the private emolument and advantage of the city, as for the public good; and that the defendants *quoad hoc* were to be regarded as a private company, and to be dealt with accordingly; that they stood upon the same footing in this respect as would any person, or body of persons, upon whom the like special franchise had been conferred.

The rights and privileges thus granted are altogether distinct and different from those with which the defendants are invested under the charter as a municipal body. The latter class comprises a large body of political powers, granted solely for public objects and purposes, with which the private interest and estate of the defendants, strictly speaking, have no concern. These powers are conferred for the benefit of the city as a community, and the end sought to be attained, its good government.

On looking into the charter it will be found to embrace an extensive grant of political power, legislative, executive and judicial, which, so far as granted, represent these great departments of the state government, and which are lodged with the defendants in their capacity as a municipal cor-

poration. The legislative power is conferred upon the common council; that body is empowered " to frame, constitute, ordain, make, and establish, from time to time, all such laws, statutes, rights, ordinances and constitutions, which, to them, or the greater part of them, shall seem to be good, useful or necessary for the good rule and government of the body corporate." Power is also given to inflict penalties for the violation of any ordinance or by-law passed by this body.

The first section of the act of 1830 (*Laws of* 1830, *chap.* 122) also declares that the legislative power shall be vested in a board of aldermen and of assistants, who, together, shall form the common council of the city; and the seventeenth makes the mayor the head of the executive department, whose duty it shall be to recommend to the common council all such measures connected with the police, security, health, cleanliness and ornament of the city, and the improvement of its government and finances; and to be watchful and vigilant in causing the laws and ordinances of the city government to be duly executed and enforced, and to keep a general supervision over the conduct and acts of all subordinate officers; and the twenty-first section declares that the executive business of the corporation shall thereafter be performed by distinct departments, which it shall be the duty of the common council to organize and appoint for that purpose. This duty the common council have performed, and had before the date of the covenant or contract in question. One of the departments thus organized under the statute of 1830, is " the Department of Cleaning Streets."

Now it certainly requires no argument to prove that the powers of the defendants, brought into exercise in forming and entering into the covenant and stipulations in question, providing for cleaning the streets, public wharves and piers of the city, and sweeping the same, belonged to and were part and parcel of its legislative and executive authority,

wholly independent and disconnected from the particular
class or body of powers having reference to their interest
and affairs as a private company. The proposition was
scarcely denied on the argument. Indeed, the terms and
conditions of the several covenants and stipulations on the
part of the plaintiffs, embraced within the. contract, are
little more than transcripts of the duties of the office of
superintendent of streets in the city, and of the street
inspectors of the several wards, as prescribed in the second,
third and fifth titles of chapter ten of the ordinaces of the
common council, under the head " Of the Department for
Cleaning Streets," passed 14th May, 1839. (*By-laws and
Ordinances of the city of New York, pp.* 63, 73.) So far as
the argument goes to the regulation of the mode and man-
ner of cleaning and sweeping the streets, it partakes of the
legislative power of the city; and so far as it fixes upon
the individuals to execute the duties, it concerns the execu-
tive authority; both, however, are public duties, devolved
upon the defendants in their municipal character, the exe-
cution of which is lodged in the common council. Then
was it competent for this body to tie up and embarrass the
execution of their public duties, whether legislative or
executive, by contract or otherwise? In other words, was
it in the power of the common council to bind its legisla-
tive capacities by any private arrangements or stipulations,
so as to disable itself from enacting any law that might be
deemed essential for the public good ?

The proposition, I apprehend, is too clear for argument.
It requires but little reflection to see that, if this could be
done by that body, or any other representing the defend-
ants, there would soon be an end of all legislation in the
city. Every public duty being the subject of private con-
tract or arrangement, like the one in question, might be
placed beyond the control of the city authorities for any
given length of time, until nothing would be left for the
exercise of legislative discretion; for if it were practicable

for the common council to divest themselves of all power and discretion over any one public duty, of which they are made the sole depositary by the charter, and to place it permanently in the hands of another, I do not see but the same thing might happen to all. It would be impossible to distinguish.

It appears to me, therefore, if we had no decisions on the subject, a consideration of the nature of these duties, and the object and purpose for which granted, would at once forbid all idea of any power on the part of the corporation to divest itself of the right to exercise a constant control and supervision over the execution of them; but authorities are not wanting upon the point.

In the case of the *Presbyterian Church* agt. *The Mayor, &c.,* (5 *Cow.,* 538,) it was expressly determined that the corporation could not abridge its legislative powers by contract. That was an action for breach of a covenant of quiet enjoyment, which the city had entered into in leasing a lot of land to the plaintiffs. An ordinance had been afterwards passed by the common council, concerning the health of the city, by which the plaintiffs were prohibited from the use and enjoyment of the property for the purpose for which it had in part been conveyed. This was relied on as a breach of the covenant. The court say they (the corporation) had no power, as a party, to make a contract which should control or embarrass their legislative powers and duties; that their enactments in their legislative capacity were to have the same effect upon their own individual acts as upon those of any other persons or the public at large.

Again, the court remark, there is a seeming inconsistency in maintaining that the ordinance constituted no breach of the covenant, where both were made by the same party. But the solution was that the defendants had no powers to limit their legislative discretion by covenant, and they were not estopped from giving that answer.

The same doctrine was laid down in the case of *Gorzhen*

Mayor, &c., of New York agt. Second Av. Railroad Co.

agt. *The Corporation of Georgetown*, (6 *Wheaton*, 593.) "A corporation," MARSHALL, Ch. J., observes, "can make such contracts only as are allowed by the acts of incorporation. The power of this body to make a contract, which should so operate as to bind its legislative capacities forever thereafter, and disable it from enacting a by-law which the legislature enables it to enact, may well be questioned. We rather think that the corporation cannot abrogate its own legislative powers." (*See also Stuyvesant* agt. *The Mayor, &c.*, 7 *Cowen*, 588.)

If the foregoing view be correct, of which I cannot entertain a doubt, then the pleas constitute a complete defence to the action. Take the covenant in question in any point of view presented, either as proceeding from and founded upon a public ordinance of the common council, or as a private contract entered into between them and the plaintiffs, involving subject matters belonging to their legislative duties, the subsequent legislative act of that body had the effect to repeal the one and abrogate and annul the other. The remaining question is one of pleading. The third and fourth counts, I am of opinion, are defective, in not averring the performance of the covenants and stipulations on the part of the plaintiffs, assumed by them to be kept and performed as a condition precedent to any right or claim to the stipulated compensation for their services.

Judgment for the defendants on all the demurrers.