Robertson, Ch. J.
If there were any means’ of escape from the binding authority of the decision in the court of highest resort in this state in the case of Darlington v. The Mayor, &c. of New York, (31 N. Y. Rep. 164,) a very serious question would arise, to wit, how far the statute of 1855, under which the plaintiff claims, (N. Y. Sess. Laws of 1855, ch. 428,) was repealed, as to the cities of New York and Brooklyn and the whole metropolitan district, by the passage of the metropolitan police act of 1857. (New York Sess. Laws of 1857, ch. 569.) So gross an injustice could hardly he presumed to have! been intended to be perpetrated as to deprive a municipal body, as such, of all power of concerted action in having means on hand to prevent a riot aid yet make it responsible for its consequences, however unexpectedly it occurred. Such an appropriation of property could hardly be anything but confiscation. I do not, however, perceive that the case of Baldwin and another v. The Mayor, &c. of New York,) lately decided in the Court of Appeals, (MS. April term, 1866,) or the opinion delivered in it, however, sound and just, has so disturbed the foundation of- the decision in the first mentioned case, as to the constitutionality of the law of 1855, as to render it still an open question. The right of obtaining a judgment under that statute for damages, is entirely distinct from any question as to the mode of satisfying it. This court would be bound to adhere to its own decisions in-Davidson v. The Mayor, &c. of New York, and Darlington v. the Same, (2 Rob. 230 et seq.,) if such statute he not imperative that such judgment is to be satisfied by an execution in the ordinary way against property held by the city corporation, hut contemplates some other mode of satisfying it. But if the statute be thus imperative, and if all prop: erty -held by the defendants as a corporation is subject to *398 the call of the state for any purpose, whenever and however it chooses to claim or apply it, and such judgment and an execution thereon be the mode of reaching it, as seems to be laid down in the case in the Court of Appeals already cited, (Darlington v. Mayor, &c. ubi sup.) we are bound by that decision, and not at liberty to doubt its correctness.
There is no room under the statute of 1855 for any question of diligence on the part of the city authorities. It is imperative, if the party damnified 'has not been guilty of any want of diligence on his part. Eor could any failure of a bailee, such as Marsten, to notify the mayor or sheriff be imputed as an omission against the plaintiff. Such notification is a mere question of good faith, and there is no evidence before us that he, the plaintiff, knew of any threats of, or expected a riot. Some ‘question might, perhaps, be ■raised on the exclusion by the statute, (p. 801, § 3,) of a party damnified by a riot from recovering any thing unless he “shall have used all reasonable diligence to prevent such damage.” What is meant by this, is not, perhaps, very definite. It evidently does not confine the requisite diligence to exertions during a riot; otherwise, it would have said “ shall use.” But “ shall have used ” clearly refers to the time anterior to some event, (which, of course, is the injury complained of as a consequence of the rio.t,) and was meant, undoubtedly, to refer to previous precautions and care used to prevent destruction by a mob. Those who seek indemnity against the action of a mob, are at least bound to keep property-likely to be the objects of attack, in the position a man of ordinary prudence would keep it if he wished to guard against a mob. It might be doubted, in this case, whether fire arms in a city, during a highly excitable state of the public mind and a civil war, were protected with reasonable diligence by being left in the work shop of a gunsmith, without extra fastenings or barriers. ■ The referee, however, did not pass upon that question, as one of fact, and questions of law involved in it may be postponed, until *399 it is seen whether other facts in the case may not render a decision upon it unnecessary.
¡Nor will it be necessary, in this case, as it stands before us, to consider whether the mere theft of property during a riot sufficiently constitutes an injury or destruction within the meaning of the'statute. The occasion of its passage, as well as its language, would seem to imply, rather injury from the passions of a mob, than abstraction by a band of thieves. The report of the referee in this case, has rendered any question as to the injury superfluous, as it has found that the guns for whose entire value he allows, were rendered worthless in consequence of the riot, and thereby destroyed, and the guns for injury to which he allows' compensation, were damaged to the sum allowed. This leaves the sole question upon it one of fact, whether so many guns were rendered worthless by the rioters, and so many injured to the extent of the damage allowed.
' ¡No spectators .of the conduct of the mob on the occasion in question, examined as witnesses on the trial, saw destroyed, injured or carried away, any thing like the number of guns reported by the referee. The existence of fragments of any thing like as many then destroyed or injured, was not established. And above all, no evidence was given of the quantity of remains of broken boxes which were not carried away, so as to obtain an approximation to their numbers, although it was proved enough to contain the rescued guns and parts bf guns, were found unbroken. The only witnesses who spoke of destruction of the boxes, were the plaintiff, (who, although he did not see them broken, said they were “smashed,”) and Marsten, who spoke of them as being broken up; but neither of them specified any number, and, although the plaintiff so saw them the day after the riot, forty-four cases (brought from the factory, wherein to pack the rescued guns) were found there whole a week after the riot. ¡No mention was made by any witness of unbroken and unopened cases of arms being hurled from the fifth story into the street, which could easily have been done by the rioters, *400 and would have been the most effectual and rapid way of demolishing the boxes and getting at the arms to destroy them, if that were the object. Although, so far as the purpose of the rioters was concerned, it seems to have been rather to procure arms for purposes of plunder, or arming themselves, than merely to destroy a particular kind of property, or injure obnoxious individuals, which generally are the objects of a riot.
The referee’s report was evidently based upon an assumed presence of the number of guns specified by him in the factory in question, and therefore that the .disposition manifested by the rioters to destroy them, their destruction of a considerable number, and the opportunity to destroy all, and the final disappearance from such buildings of all the guns, would together establish their actual destruction by the rioters. Eo doubt Marsten originally packed 8123 carbines belonging to the plaintiff in 157 cases, and sent them in the year 1862 to the opposite factory, where they were deposited; but how long they remained there does not appear. The plaintiff would not state that he ever saw all of such guns in the factory in question, after the removal back. Even Mr. Taylor, who took samples of the guns from some of the cases, could not say that he knew the number of all there, Marsten only knew they were there, by seeing the eases in his factory. Eo one testified that he knew that the contents of the cases remained the same, when they were moved back, as when they went to the Opdyke factory.- Marsten never saw any of the guns after they were first moved, until he repaired the five hundred sold to the state. They remained without any examination for eighteen months before the riot, except to get the samples. The evidence, therefore, was not such as to place it beyond all doubt, that the cases and their contents remained until July, 1863, at the time of the riot, as they were when they were moved to the Opdyke factory. There was ample opportunity, and, of course, the possibility of a removal of some of the guns before the riot, and even before the removal from the *401 Opclyke factory, and whether, with the knowledge of either Marsten or the plaintiff was wholly immaterial.
There was also not enough evidence on the trial, that so many were destroyed or carried off. All that was done by the rioters in the presence of all the witnesses did not establish that 3000 guns were taken out' of the factory in. question by the rioters. Burden, although on the watch all the time, did not see fifty thrown out of the windows on the first attack. ■ Schmidt only saw two dozen, although he saw more carried down stairs, whose possession was struggled for by the mob. Bergman saw only fifty thrown into the avenue, and he was looking at them for half an hour or an hour. He also saw some carried away; but how many he did not state. The father of Mr. Marsten, who appears to have been there all the time, could only say that he saw several hundred in all thrown out. None of the witnesses (if they stated any time at all) were very precise as to the time when the guns, which they saw, were being thrown out. But even if the witnesses saw different arms thrown out, the whole would fall far short of even the number brought to the police head-quarters. There was, undoubtedly, evidence that some of those thrown out were carried away, although there was stronger evidence, that on the first occasion more were brought down the stair case, although very narrow, and carried away, than were thrown out. There was no evidence that those so. brought down and carried away were injured at all; and to that extent, at least, the report of the referee is unsustained.
The improbability, also, of the destruction of so many guns by the means proved to have been used, in the presence of so many witnesses, considering the time, employed and numbers engaged, was very great. Few guns were thrown out of the windows until the police came, and then they were treated so, because the rioters could not carry them away by the stairs. The police force appear to have taken fifteen or twenty minutes, or perhaps half an hour, on each occasion, to expel the rioters, part of whose force *402 was diverted to resisting the entrance of the former. Only ten or fifteen men seem to have been engaged at a time in carrying down guns or throwing them out. It would require fifty to be thrown or carried out every minute in order to exhaust the whole number in an hour. In such case, hundreds would have been seen at a time piled upon or scattered about the street. The fall of such an iron shower would hardly have been described in the tame manner it was by the witnesses. The guns were, as testified, thrown out singly and not by cases, and no witness gave the impression of such a rapid rain of, or escape with, them, as was necessary to get out three thousand guns in an hour, or less. The evidence was scarcely sufficient to warrant a finding that (if any) many over a thousand had beeir taken out in the presence of the witnesses. What took place in their absence was, of course, mere matter of conjecture. The evidence,' also, tended to show that most of those thrown or carried out were rescued and brought to police head-quarters. Making allowance for the time necessary to open the boxes and bring the arms down stairs or throw them but, and the struggles for their possession before the police first arrived, but few could have been carried away. Captain (the police officer) Dilks testified that, after a conflict, they took from the mob in the street all the arms they had, and in both attacks -captured two hundred pieces. More than six hundred more were brought to the police head-quarters, where all the broken ones were repaired that were1 capable of it. The referee, even found that all the guns in the hands of the mob, or others, including those taken down stairs and others in the building, as well as others taken away by the rioters, were destroyed. But there is no justification for' such finding, or that as many were destroyed or injured by the rioters as he has found. The damages found by him were, therefore, excessive.
But this is not all. The plaintiff testified that some (40 or 50) of the arms bought by him of the United States gov *403 ernment were badly damaged, and also that some of them had been previously used, in actual service, leaving about five thousand new ones out of the whole nine thousand. Any of those so used, which were defaced, were scraped and oiled over by cabinet makers. He paid nothing for the cases. The highest price paid by him for any one of such guns was $3.50. The highest price paid for improvements on any of them was $1.50. He only brought up the price to $8 a piece by bringing in the cost of trips by him to Washington respecting the cost of purchase and other unknown expenses. After being stored eighteen months, five hundred of them sold to the state of New York were repaired, there being no other carbines procurable, and a confederate army threatening an attack on the north. Out of over eight hundred of such' guns rescued from the rioters, nearly one-ninth were used, much over one-half in good working order, a little short of one-third rusty, and but thirty-two broken. After deducting from the whole amount allowed by the referee ($42,632.50) the value of those reported by him to be rendered entirely worthless, at the sum fixed by him ($15) and of the cases (121) at his valuation ($2.50) there remains about $3000 to be allowed for injury to the residue.
The number of guns left, after deducting those actually destroyed, (2620) would be five hundred and three, and the injurywto each of them by the rioters about $6. This was not sustained by any evidence. But two hundred and ninety-six of those saved were found to need any repairs, of which but thirty-two were broken. The rust was more likely to have been the result of remaining unopened than of being carried out by the rioters. The cost of cleaning and repairing the rusty or broken ones was proved by competent, uncontradicted evidence not to exceed $1.75, which would not amount to one-half of the sum allowed. This, of itself, would also render the damages excessive.
Two dollars and a half was allowed by the referee in this case for each box or case, although the plaintiff had obtained them gratuitously, and $15 for guns for which the *404 latter had only paid $3. The report, therefore, if allowed to stand, would operate as a judicial sale without delivery to the defendants of all the guns owned by the plaintiff, on the hare possibility of their having been injured, at the highest imaginable market price, although the defendants were not in fault for the.occurrence of the riot, having been deprived by the state government' of their police, and by the federal government of their most efficient military force to defend another state. The report niust be set aside for excessiveness of damages, the judgment thereon reversed, the order of reference discharged and a new trial had, with costs to abide the event.