## NEW YORK COMMON PLEAS.

RICHARD D. BRINCKERHOFF, appellant agt. THE BOARD OF EDUCATION FOR THE CITY AND COUNTY OF NEW YORK, AND THE SCHOOL OFFICERS OF THE NINETEENTH WARD, impleaded with THE MAYOR, &c., OF NEW YORK, and others.

Under an execution upon a judgment against a *municipal corporation*, the property of the corporation *not devoted to public use*, may be taken and sold to satisfy the judgment. (*Following the case of Darlington* agt. *Mayor, &c., N. Y.*, 31 *N, Y.*, 164; *S. C.* 28 *How.*, 352).

But if there is no such property, the remedy is by *mandamus* to compel the payment of the judgment out of any money or fund under the corporate control, or to compel the raising of it by tax, when the corporation is clothed with the power to impose a tax; and if it should not be, that then the creditor is placed in the same condition as are the creditors of the state or of the United States.

This rule applies to judgments under the *mechanic's lien law*. Therefore, under that statute a lien cannot be acquired for work done or materials furnished towards the erection of a *public school-house*, erected in accordance with the provisions of certain laws of the state relating to the city of New York, and which is devoted by these laws to a public use.

And no such security can be obtained under the mechanics lien law, upon property, which, for reasons of public necessity, cannot be taken and sold to satisfy judgments obtained in ordinary civil actions.

*General Term, June,* 1869.

*Before* DALY, F. J., BRADY *and* BARRETT, *Judges.*

THE action was brought to foreclose a lien in favor of a sub contractor upon a public school-house in 42d street, in the city of New York.

The contract for the carpenter's work was between the school officers, approved by the board of education, and William Coulter.

The plaintiff furnished the sash and glass doors for the building, under a contract with Coulter, in pursuance of, and in conformity with, Coulter's contract.

The referee found that the plaintiff had performed work, and furnished materials to the full amount of his lien, to-

wards the erection of the school building, under a contract with Coulter, the contractor, and in conformity with and in pursuance of the contract for the erection of the building, and that there was a balance due the contractor more than sufficient to cover the lien.

But he found, as a conclusion of law, that owing to the peculiar provisions of the contract, no valid lien could be put upon the building, in favor of Coulter, the contractor, or of any sub-contractor.

BENJAMIN G. HITCHINGS, *for plaintiff.*

I. The conclusion of law which the referee found, and upon which he based his judgment, is erroneous.

By referring to the opinion of the referee, it will be seen that he came to this conclusion upon the ground that the contract provided that the payments under it should be made by drafts drawn and countersigned by officers of the board of education upon the chamberlain of the city, and that a fund having been raised by taxation for the erection of this school building, and the contractor having agreed to receive payment by drafts on this fund, he has waived his right to a lien, and that, therefore, the sub-contractor can have none. (*Opinion of referee, contract art. 6th.*)

1. The provision of the contract, that payment should be made by drafts on the city chamberlain, signed by certain officers of the board of education, and countersigned by other officers of the same board, was merely a provision prescribed by the statute to prevent frauds by making these officers checks upon each other. Its effect upon the rights of a sub-contractor is no different from that of a provision to pay by checks on a bank, or to pay in cash.

There is nothing in it tending to affect the right of a contractor, or of sub-contractors, to acquire valid liens upon this building.

If the proper officers should refuse to give the drafts, when the contractor became entitled to payments, or if the drafts, when given, should turn out unproductive, why could not the contractor enforce a lien as well as if the contract had been simply to make the payments in money.

Clearly these drafts where intended by both parties to be equivalent to money, and by agreeing to take them, the contractor waived none of his rights.

If the contractor had agreed to take the note of a third person in absolute payment, it would have presented a very different question, but even in that case, it would be difficult to maintain that a sub-contractor could not acquire a valid lien. It would seem that the utmost which the owner could claim in that case would be that upon giving the note of the third person for the benefit of the lien holders, his building be discharged of liens.

But, in this case, the agreement was in substance that the board of education would pay by checks on their own bankers.

This court have decided, in a well considered case, which has never been doubted or called in question, that the lien law extends to and covers school buildings in the city of New York. (*McMahon* agt. *The School Officers of the 10th Ward*, 12 *Abb.*, 129).

The reasoning of the referee is entirely unsound, and has no logical tendency whatever to support his conclusion.

In the first place he labors to show that the contractor having agreed to take pay by drafts could not maintain an action, but would have to resort to mandamus; and he cites certain cases where mandamus was held to lie in very peculiar cases, but they have no relevancy to this case.

Whether the remedy of the contractor would be by action or by mandamus, does not affect the question of his right or that of the sub-contractors to the liens which are given by the statute.

Again, the referee argues that the taxpayers may have contributed the money to pay for the building, and yet it may be sold to satisfy liens.

But the owners cannot be compelled to pay, by reason of all liens, more than the contract price, and if they fail to pay the contractor or to satisfy the liens of subcontractors, what answer is it either to a contractor or subcontractor that the money to pay him or them has been raised by taxation and has or has not been squandered by the agents or officers of the owners?

Again, the referee says, that by agreeing to take pay in drafts, the contractor waived his right to any lien, and he cites certain cases (*Trust* agt. *Pirson*, 1 *Hilt.*, 292, *and others*) whieh recognize the well settled principle in relation to common law liens upon chattels for work done upon them, that by parting with the possession or giving time for payment, the lien may be waived.

These cases are entirely inapplicable to any question upon mechanics' liens on buildings under the statute, and besides, in this case, there was no agreement to give time, nor any provision in the contract inconsistent with a lien.

In this case, why should not the contractor or subcontractor have the lien which the statute gives for work and materials upon the building? True, they agree to give him drafts, but they may not give them or they may turn out unproductive. Again, the contractor may not pay his subcontractors, and why should they be deprived of the security which the statute gives them?

II. The ground upon which the defendants themselves have put their defense is equally untenable.

They set up in their answer, that by the fifth article of the contract it is provided that the contractor shall not suffer any liens to be put upon the building, and that any such lien, until it is removed, shall preclude any claim for payment under the contract; and insist, that such liens having been filed, they are not only discharged from liability to make

payments to the contractor, but that the liens of subcontractors are void.

1. The plain and obvious meaning of the clause in the contract is, that if liens are put upon the building the contracting parties shall not be obliged to pay the contractor until such liens are removed, because otherwise, besides paying the contractor they might be compelled to pay the liens.

It cannot be pretended that the contract provides that liens so put upon the building shall be void; but the provision implies that they may be obliged to pay them.

2. The argument is, that whilst liens are existing upon the building nothing can be due to the contractor on the contract, and therefore the liens are void. This is the merest and weakest sophistry. The existence of liens does not prevent anything from being *due to the contractor*, it only precludes him from the right to recover what is due to him, whilst lienholders stand in a position of being able to compel payment of their liens, out of what is due to him.

The argument, that the owners are not bound to pay the contractor what comes due to him under the contract, because there are liens, and that the liens are void because they are not bound to pay the contractor, is very unreasonable if not absurd.

3. If the contract had provided that there should be no liens upon the building in favor of subcontractors, or that such liens should be void, such a provision in the contract would be in direct contravention of the statute, and would be void.

4. The only limit to the liability of owners to liens is that they shall not be compelled to pay more, by virtue of all liens, than the contract price of the building, and they cannot be compelled to pay again what they have actually and *bona fide* paid to the contractor in pursuance of the contract before the filing of liens—but they cannot abrogate

and annul the lien law and make void all liens by simply inserting a clause in the contract intended to produce that effect.

The above points cover the whole ground upon which the referee decided the case—but there is yet another objection to a recovery by plaintiff which it may be proper to consider.

III. The objection taken by the answer of the Mayor, &c. of the city, that plaintiff had not presented the claim upon which his lien is founded, to the comptroller, pursuant to the act of 1860, is not well taken.

1. It was not such a claim as comes within the intent and meaning of the act.

It was not a claim against the city, but against William Coulter.

It would have been absurd to present it to the comptroller ; he could not adjust it or settle it.

The amount or validity of plaintiff's claim under his lien is of no interest to the city, even as owner of the building. It can be enforced only to the amount that is due the contractor.    Neither the city nor its financial officer the comptroller, is the party to pay for the school building, or to settle what is due to the contractor, under his contract.

The object of the law was to prevent the city from being put to costs, which might be saved by a settlement of the claim.  But the plaintiff's lien and the foreclosure of it could put no costs upon the city, unless they come in and unnecessarily litigate against a just claim.    There is no need of their defending separately from the board of education in any event.

The object of plaintiff's lien, and the foreclosure of it is merely to get from the board of education, what is due to him from Coulter, out of what they owe to Coulter—the city is a necessary *formal party* only, but has no real interest in it.

If it was necessary to present the claim of plaintiff to the comptroller at all, it would seem that it should have been presented twenty days before filing the notice of lien, for that was the commencement of the special proceeding.

*Russell* agt. *The Mayor*, (1 *Daly*, 262), was a claim against the city for pecuniary damages.

2. This provision of the statute is purely for the benefit of the city, and can be waived. It must be taken advantage of on the first opportunity, or it will be considered as waived. (*Russel* agt. *The Mayor*, I *Daly*, 262).

In case of a special proceeding, the allegation required by the statute must appear in the *moving papers*. (*See act of* 1860). The first moving papers in this case were the notices to come in and interplead. On the return of that notice the counsel for the city consented to an order that plaintiff serve a complaint, &c. They should then have moved to dismiss the proceedings, for non-compliance with the statute, if they intended to insist upon it.

3. If such an allegation was necessary in the complaint, the objection for the want of it should have been raised by demurrer, or by motion to dismiss.

As it was an objection appearing upon the face of the complaint, it could not be taken by answer. (*Voorhie's Code*, § 148, *note a.*).

IV. The judgment upon the report of the referee should be set aside, and a new trial granted, and as there is no question upon accounts, it should not be sent again to a reference.

ABRAHAM R. LAWRENCE, JR., *for board of education, &c.*,

I. The plaintiff, appellant showed no cause of action against the defendants, the board of education, the school officers of the nineteenth ward, or the mayor, aldermen, and commonalty of the city of New York.

II. The claimant under the mechanics' lien law, must show, before he can have a judgment, that work has been done for which the owner is *actually liable*, according to the *terms* of his *contract* with his *contractor* for the erection of the building. (*Cunningham* agt. *Jones*, 3 *E. D. S.*, 651; *Pendleburgh* agt. *Mead*, 1 *E. D. S.*, 728; *Spaulding* agt. *King*, 1 *E. D. S.*, 717; *Doughty* agt. *Devlin*, 1 *E. D. S.*, 626; *Cronk* agt. *Whittaker*, 1 *E. D. S.*, 647; *Nolan* agt. *Gardner*, 4 *E. D. S.*, 727).

*a.* In other words, the claimant can have as against the owner only the rights and claims at the time of the filing of the notice to foreclose the lien under section 4th of the act of 1851, *which are possessed by the original contractor*, and unless such facts are established as would in a proper action entitle the original contractor to recover against the owner, the claimant cannot have judgment for the foreclosure of his lien.

*b.* Now, in this case it cannot be pretended that Mr. Coulter, the original contractor, could maintain an action on the contract against these respondents.

The referee has found, that in addition to the alleged lien of the appellant, there were liens against the building in question filed prior thereto, in favor of White for $1,964.15, and $380; and in favor of Menzies and others for $536.38, making an aggregate of $2,880.53, and that said liens were in suit at the time this action was tried.

By the 5th section of the contract it is provided that "any lien, attachment, or other incumbrance, *until it is removed, shall preclude any and all claims* or *demands for any payment whatever under or by virtue of this contract.*"

Clearly, then, Mr. Coulter could have no right of action against these respondents until these liens were removed.

How, then, if the decisions above referred to, and numerous others to the same effect which are not here cited, are to stand, can it be said that the appellant can succeed in this proceeding?

Any construction of the contract, which would enable a lien creditor to enforce his lien, strikes from the contract one of its most important provisions, and instead of placing such lien creditor in the same position as the original contractor, would give to him other and greater rights.

*c.* That this court has always drawn a distinction between the fact whether work had been done and money earned, and whether money had *become payable* under the original contract, is shown clearly by the case of *Spaulding agt. King*, 1 *E. D. S.*, 717.

In that case the court held that the claimant must show, before he could maintain his action against the owner, that payments have *become due under the contract with the owner.* (*And see cases supra.*).

III. The filing of the appellant's own notice of lien was a bar to any action against the respondents, either by Coulter or any party who did work or furnish materials for the building in question under him : because by the very terms of the contract between Coulter and the school officers, nothing was to be *due*, nor was any claim or demand to be *payable* to him, until such lien was removed. (*Contract, section 5*).

*a.* It has been shown under the second point, that the lien creditor must prove that under the original contract monies have not only been *earned* by the original contractor, but that they must, under the contract, be also *payable to* him.

In *Doughty agt. Devlin*, 1 *E. D. S.*, 626, it was held that "the owner cannot be required to pay money to the claimant *before it becomes payable*, according to the *owner's contract*, for the erection of the building."

The court also held, " that when an owner had contracted with another to build a house, all sub-contractors and others furnishing labor or materials to the contractor, *must, so far as they rely upon the owner or his house* as security under the mechanic's lien law, be deemed to do so in *subordination*

to the owner's contract, and upon the *credit* which the *terms of such contract offer for their reliance."*

If a recovery could be had in this case, Mr. Brinckerhoff could not be deemed to hold his rights against the building in question, in *subordination* to the contract between Coulter and the school officers; because, by that contract, no money became *payable to Coulter until the appellant's lien, and all other liens, were removed.*

If the apppellant possesses any such rights as he claims here, they are *paramount* to the contract between the school officers and Coulter, instead of being *subordinate* to it.

*In Cronk* agt. *Whittaker,* 1 *E. D. S.,* 647, the court held that "the owner cannot be required to pay money to the *claimant* before it *becomes due to the contractor."*

Clearly no money is due to Mr. Coulter, under the contract, until it is *payable.* If a man gives his note for $1,000, payable in three months after date, it cannot be said that the $1,000 is due to the payee until the three months have expired. So here no money becomes due to the contractor until the lien is removed.

In fact, the provision in the 5th section may be regarded as a term of credit given by the contractor to the owner.

IV. The respondents were obliged to and did expend the sum of three thousand two hundred and seventy dollars to finish the building in question, after Coulter abandoned it.

This amount was $800 more than the amount claimed to be due to Coulter for the fifth and sixth payments under the contract as modified.

In any action which Coulter might have brought against the respondents, this expenditure would have defeated a recovery by him under the rule laid down in cases above referred to. (*See Smith* agt. *Ferris* 1 *Daly,* 18).

V. The respondents also insist that the liens filed by White and Menzies, amounting to the sum of $2,880.53, independently of the provisions of the 5th section of the contract, bar and preclude the enforcement of any lien

which the appellant might otherwise have, until such liens are disposed of.

VI. The building in question being a part of the public property of the mayor, aldermen, and commonalty of the city of New York, and having been expressly acquired for *educational purposes*, the provisions of the "act for the better security of mechanics and others erecting buildings and furnishing materials therefor, &c." passed July 11, 1851, as amended April 13, 1855, do not apply. (*Darlington* agt. *Mayor, &c.*; *opinion of Denio, C. J.,* 31 *N. Y., p.* 164).

VII. The appellant was not entitled to a judgment for the foreclosure of his lien, because he had not presented the claim on which it was founded to the comptroller of the city of New York for payment or adjustment, or complied with the provisions of the act, entitled " An act in relation to actions, legal proceedings, and claims against the mayor, aldermen and commonalty of the city of New York," passed April 14, 1860. (*Laws of* 1860, *p.* 645.)

*a.* The title to the building in question is vested in the corporation of the city of New York, by the "Act to amend, consolidate and reduce into one act, the various acts relative to common schools in the city of New York," passed July 3, 1851. (*Davies' Laws, p.* 1057, *Sec.* 25.)

The provisions of the act of 1860 embrace *all actions and special proceedings* against the mayor, &c., and of course a proceeding of this character. As the fee of the property is in the city, and these respondents are but trustees, if a judgment for the foreclosure of the alleged lien of the appellant cannot be had against the owner, for the reason aforesaid, it follows that no such judgment can be given against the trustees.

*b.* The objection above referred to is specifically taken in the answer of the mayor, &c.

VIII. The appellant was not the real owner in interest of the claim or demand for which the lien was filed at the time

the proceedings to foreclose his lien were initiated, nor at the trial of this action.

This point was made in the answer of the respondent, Coulter, and, as the claimant, a subcontractor can have no judgment against the owner of the building, unless he is entitled to a judgment against the contractor for whom he did the work, it is competent for the respondents to avail themselves of that objection.

IX. By the terms of his contract, Coulter agreed to receive, in payment for the work to be performed and the materials to be furnished by him, *drafts payable to the order of the person entitled to receive them*, drawn upon the chamberlain of the city of New York, signed by the president and clerk of the board of education, and countersigned by the chairman of the finance committee of the said board.

The referee was right in holding under these circumstances that a special fund having been raised by taxation for the erection of this school building, and Coulter, the contractor, having agreed to receive payment by drafts on this special fund, he could not by action against the mayor, aldermen and commonalty of the city, or the board of education or the school officers, reach the general property of the city, or this school building in particular. (*Baker* agt. *City of Utica*, 19 *N. Y. R.*, 326).

X. The case of *McMahon* agt. *The Tenth Ward School Officers* (12 *Abb.*, *p.* 129), is not in conflict with the views expressed in the respondent's sixth and ninth points, for the reason that the grounds taken in those points were not urged in that case.

XI. The respondents also contend that the assignment made by Coulter to Foster for the sum of three hundred dollars entitles them to add that amount to the sum they are entitled to deduct from the amount which would have been due to Coulter on account of the fifth and sixth payments under the contract.

*a.* The respondents had notice of such assignment and were bound by it. This assignment was made and was filed with the clerk of the respondents, long before the appellants' lien was filed.

XII. Again, the order given to White by Coulter, dated November 14, 1862, for $1,500, amounted at least to an equitable assignment of so much of the fifth and sixth payments, and White thereby acquired a specific equitable lien upon such payments for the amount of such order. (*Bradley* agt. *Root,* 5 *Paige,* 632; *Cowperthwaite.* agt. *Sheffield,* 1 *Sand.,* 417; *Yeates* agt. *Grover,* 1 *Vesey, p.* 280.)

*a.* The intention of Coulter to appropriate the amount of fifteen hundred dollars out of those instalments is apparent on the face of the order, and that is the test by which we are to be governed in construing the effect of the order.

*b.* There was no necessity for a formal acceptance of the order by the board of education, in order to give it effect in favor of White.

*c.* Besides, Boese, the clerk of the board, did accept the order on the part of the board.

His testimony shows that he followed his usual custom as *ex officio* treasurer of the board. He placed the order with the contract, so that when the instalments to which it related became due it should be paid. (*Beers* agt. *Phœnix Glass Co.,* 14 *Barb.,* 358.)

XIII. In order that the court may see at a glance precisely how the respondents' account with Coulter stands, the respondents present the following figures for its inspection.

Amount expended to finish building when abandoned by Coulter........................ $3,270.69

Amount of draft in favor of White, Nov. 14, 1862............................................ 1,500.00

White's first lien................................ 1,964.15

White's second lien............................ 380.00

Menzies' lien.................................... 536.36

Foster's order.................................      300.00

    Total.............................      $7,951.20

All the above liens and claims of White, Menzies and Foster were filed and arose prior to the appellants' alleged claim.

XIV. There is no error in the judgment entered on the report of the referee, and it should be affirmed with costs.

*By the court,* DALY, F. J., I expressed the opinion in *Mc Mahon* agt. *The Tenth ward school officers, &c.,* (12 *Abb.,* 129), that a party who performed work towards the erection of a public school house in the city of New York, had a lien upon the building, which could be enforced under the acts for the better security of mechanics and others erecting buildings, or furnishing materials therefor in this city (*Laws of* 1851, *ch.* 513 ; *of* 1855, *ch.* 404). But the point was not taken in the case, nor necessarily involved, as the judgment was reversible upon other grounds. Assuming that a lien could be acquired, in the notice of lien filed in that case, the board of school officers, the board of education, the mayor, aldermen and commonalty of the city, were alleged to be the owners of the school-house, and the notice to foreclose it was served upon each of these bodies.

At the hearing, the referee dismissed the complaint, upon the ground, that the mayor, aldermen, &c., were the owners of the building ; that the contract was made with the board of school officers, and with the board of education, who were not the owners nor the agents of the owners, and that consequently, there was no contract with the owner of the building, in pursuance of which the plaintiff, who was a subcontractor, could acquire any lien. The point to be determined, therefore, was, assuming that a lien could be acquired, whether the referee was right in holding that the notice was defective in alleging that the board of school officers and the board of education were, in conjunction

with the mayor, aldermen, &c., the owners. This, as the case came before us, was the only question presented, and, in conformity with a previous adjudication of this court, affirmed by the court of appeals, in *Loonie* agt. *Hogan*, 5 *Seld.*, 440), to the effect that the one for whom the building is erected, and who is to pay for it, though he has not the legal title, but only an equitable interest in the land, is the owner, we held that these three bodies, having distributed between them all the rights and powers which the owners of such a building could possess, were, for the purposes of the lien law, to be deemed collectively the owners. I, individually, was of the opinion that they were within the equitable design of the lien law. My colleagues, Judges BRADY and HILTON, gave no opinion; they simply concurred in reversing the judgment; and my own opinion upon the point stated was expressed without the examination which I have given to it, now that it is distinctly raised, and must be passed upon. It is sufficient, therefore, to say that we are not, under the rule of *stare decisis*, precluded by anything decided in *McMahon* agt. *The School Officers*, from considering and deciding whether under the statute a lien can be acquired for work done, or materials furnished towards the erection of a public school-house, erected in accordance with the provisions of certain laws of the state relating to this city, and which is devoted by these laws to a public use. (*Laws N. Y.*, 1851, *p.* 749, §§ 28, 10, 25, 27; of 1853, *p.* 635, §§ 14, 2, 11; *of* 1854, *p.* 241, § 10.)

Since the decision in the case of *McMahon* agt. *The School Officers, &c.*, the court of appeals, in *Darlington* agt. *The Mayor of N. Y., &c.*, (31 *N. Y. R.*, 164), have considered the question how far a judgment against the city can be enforced by a levy upon and sale of property belonging to, or held in trust by it, as a municipal corporation. Chief Justice DENIO, by whom the opinion of the majority of the court was delivered, held that a muncipal, equally with a private corporation, may have its property taken in

execution, if payment of a judgment is not otherwise made; but he distinguishes as exempt from the exercise of this right, such estate, real or personal, as may by law, or by authorized acts of the city government, be devoted to public use, such as the public edifices, or their furniture, or ornaments, or the public parks, or grounds, or such as may be legally pledged for the payment of its debts. These, he holds, cannot be seized to satisfy a judgment, as these structures are public property devoted to specific public uses, in the same sense as similar structures are, in use by the state government, and, though this is a distinction which appears to have been taken for the first time, it is one, that when the purposes, for which municipal corporations existing are created, are considered, commends itself as founded in public necessity.

It is said, in *Cuddon* agt. *Eastwick*, (1 *Salk.*, 193; *Holt*, 433; 6 *Mod.* 123), that a municipal corporation is properly an investing of the people of the place with the local government thereof. Chancellor Kent applies to such bodies the characteristic appellation of " local republics," and says more particularly afterwards, "they are created by the government for particular purposes, as counties, cities, towns and villages; they are invested with subordinate legislative powers, to be exercised for local purposes connected with the public good, and such powers are subject to the control of the people of the state." (*Kent's Com., vol.* 2, *p.* 304.) To which it may be added, that they are allowed, as has been repeatedly said, to assume some of the duties of the state, and enjoy property and power for that purpose, as auxiliaries of the government and trustees for the people. (*McKim* agt. *Odoer*, 3 *Bland's Ch. R.*, 417 ; *Angell and Ames on Corporations, Introduction,* § 18 ; *Darlington* agt. *The Mayor, &c.*).

Municipal corporations came into use in England in the form of boroughs, through an arrangement by which certain managers of the local community undertook to pay the

yearly rent or sum due to the superior or sovereign, in consideration of which they..were permitted to levy the old duties, and were responsible for the funds committed to their care. This privilege of farming their tolls or duties, was afterwards confirmed to them by acts of incorporation embracing other privilleges, either gradually acquired or long enjoyed in places where the Romans had introduced the municipia, or cities enjoying the local right of self-government. (*Thompson's Essay on Municipal History, pp.* 10, 11, 12; *Palgrave's Anglo Saxons, pp.* 6, 11; *Millar's English Government. p.* 340 ; *Angell and Ames on Corporations,* §§ 16, 18, 21).

Having thus the right to collect duties, and being responsible for the funds coming into their hands, it came to be recognized, very naturally, that they might on the one hand, sue to enforce the payment of duties, and, on the other, be themselves sued to compel them to discharge the obligations they had assumed. As their municipal authority and duties gradually increased, the power to bring actions, and their liability at the suit of others, was both increased and varied. Actions by and against them are to be found as early as the *Year Books,* and the power was generally conferred specifically in the acts of incorporation; but the works of authority are barren of exact information as to the manner in which judgments against them were enforced, which may have arisen from the fact that they rarely refused to pay a judgment when recovered against them, and were always able, from the nature of their powers, to procure the means to discharge it.

In *Rex* agt. *Gardiner, (Cowp.,* 86), Justice ASTON says : " As to the remedy of levying a duty upon a corporation, the books all agree that it may be levied, but they differ as to the mode." But he was speaking only to the question whether a private corporation (that is, a college) could be rated for the support of the poor of a parish. It is probable that a municipal corporation might, as was held in the

case of private and trading corporations, be compelled to appear, or obey decrees for the payment of money after execution issued by the common law process of *distringas*, under which the lands and goods of the corporation could be distrained, and, in the event of non-compliance, sequestrated. (*The Master and Wardens of the Company of Wax Chandlers, Skin.*, 27; *The African Co., id.*, 84; 1 *Ver.*, 121; *The East India Co.*, 2 *id.*, 396; *Precs. in Chy.*, 129; *The Hamborough Co., of Merchant Adventurers, Cases in Chy.*, 201).

The right, however, to recover a judgment against them, would necessarily carry with it the right to enforce the payment of it. But the mode of enforcing it, so far as I have been able to find, is by no means clearly indicated.

ROLLE, C. J., in the case of the *Town of Colchester*, (*Styles*, 267), says: "If a sum of money be to be levied upon a corporation, it may be levied upon the mayor, or upon any person being a member of the corporation." And in another case, in *Styles*, 366, the court ordered a *distringas* to levy a fine of twenty pounds, imposed after indictment, upon the inhabitants of a parish, for not keeping a bridge in repair. But I do not find in the early Abridgments of *Fitzherbert, Brookes*, or *Sheppard,* nor in that great repository of the common law adjudications, *Viner's Abridgment*, nor in the English treatises which I have examined, anything to indicate that judgments against municipal corporations ever were, or could be enforced by the seizure and sale of buildings or other property of the corporation devoted to public objects, such as jails, poor houses, markets, court houses, and other structures necessary in the local government of the place, and indispensible to enable a municipal corporation to carry out the purpose for which it is created.

There are three cases, of comparatively recent origin, all relating to the borough of Poole, a small seaport town in the south of England, in which, or in one of which, this right appears to have been recognized; but the point was

not involved, and it is apparent from the report of each case, that in no one of them was the question examined, or so deliberately considered or passed upon, as to entitle it to the weight of an adjudication upon this point.    This will appear from a very brief statement of these cases.

In the year 1837, the mayor, aldermen, and burgesses of the borough of Poole, being indebted to their town clerk for his services, gave him their bond for £4,500, payable in installments.    The first two installments remaining unpaid, he obtained a peremptory mandamus to compel the corporation to enforce payment out of the existing borough rates, or to collect another rate to pay the two installments, which the corporation having failed to do, he applied for an attachment, which was refused.    It appears to have been conceded, from the report of the case, that a mandamus would lie to compel the corporation to levy a tax, if there were no other means of enforcing the payment of the debt; but the attachment was denied, because by the 5th and 6th of *Wm.* 4 *Ch.*, 76, the employees of a municipal corporation are to be paid out of the borough fund, and not out of that portion of it which consists of rates, which the mandamus obtained required the corporation to pay, out of the existing or any future rates, thus specifying the means by which payment was to be obtained, and leaving the corporation no option to resort to any other, there being no allegation in the mandamus that the corporation had no other fund from which payment might be made (*Regina* agt. *Ledgard,* 1 *Adolph. and El. N. S.,* 616).

The town clerk afterwards obtained a judgment against the corporation upon the bond, and sued out an *elegit,* or process under which the lands of the defendant in a judgment may be given into the possession of the plaintiff, and held until the judgment is satisfied out of the rents and profits of the land, or it is paid by the defendant when the land is restored to him.    He sought under the *elegit* to obtain possession of the town hall and markets, with the

view, I suppose, of having the tolls of the latter applied to the payment of the judgment, but being unable to get possession, he brought ejectment. The corporation applied to defend, without confessing that they were in possession, upon the ground, that their property, under the 5th and 6th *Wm.* 4 *Ch.*, 76, was applicable to public purposes only, and could not be taken upon execution. The court refused the application, upon the ground that the corporation would not be prejudiced in such a defense, whether it was available or not, by admitting possession. Lord DENHAM, C. J., declaring, however, that the court did not wish to be understood as giving any countenance to the supposition that the corporate property, although directed by the statute to be applied to public purposes, and not to the private benefit of the members of the corporation, was protected from the lawful claims of persons having demands upon the corporation (*Doe ex dem. Parr* agt. *Roe*, 1 *Adol. and El., N. S.,* 700).

This was expressing a very decided opinion upon the point, but it is apparent, as I have said, that the question was not examined or so deliberately considered as to give to the case much weight, especially when, as will be shown hereafter, there has been an express adjudication in this country to the contrary.

In 1843, the corporation leased their market house, with the customs and tolls, to one Whitt, for the period of three years, at an annual rent, subject to two mortgages, which had been given in 1822. The town clerk having sued out his *elegit* before the lease was given, called upon Whitt to pay rent to him or that he would turn him out, which Whitt did, and attorned to the town clerk without the privity of the corporation. The corporation having sued Whitt for the rent due upon the lease, he set up his eviction by the town clerk, and the possession of the town clerk upon his *elegit* ; but the corporation recovered the rent, the court holding that the right of immediate possession was in

the mortgagees, and that the town clerk could not enter nor acquire any title under his *elegit,* the corporation having nothing to which the *elegit* could apply, except the legal right to the reversion, which was a very remote one, the mortgage being given for one thousand years (*The Mayor, &c., of Poole* agt. *Whitt,* 15 *M., and Wells.,* 571).

In this last case, no question appears to have been raised, either by the counsel or the court, as to whether the town clerk would, or would not, have had the right to take possession of the market under the *elegit* if there had been no mortgage, which is the only aspect in which the case has any bearing, and it is not to be regarded as of weight upon a point not inquired into, the more especially as it would seem from the decision of the cases, that the town clerk could be paid only out of the borough fund (*The Queen* agt. *Ledgard, supra*), and that his proper remedy was to compel it by mandamus (*The Queen* agt. *The Mayor of Stamford,* 6 *Adol. & El., N. S.,* 433; *Jones* agt. *The Mayor, &c., of Carmarthen,* 8 *M. & W.,* 605; *Tapping on Mandamus,* 93; *Wilcox on Municipal Corporations, p.* 356.)

Chancellor KENT, in declaring that municipal corporations can sue and be sued, remarks that the judicial reports of this country abound with cases of suits against towns in their corporate capacity for debts and breaches of duty, for which they are responsible; but he says nothing as to the mode in which judgments against them in such actions can be enforced (2 *Kent,* 275, 4*th ed.*), and the question is one upon which the authorities in this country are by no means agreed, for in some instances it has been held that their property cannot be taken on execution issued upon a judgment against them (*Chicago* agt. *Halsey,* 25 *Ill. R.,* 595); while in others it has been held that it can, or the right to take it has been impliedly recognized. (*Crafts* agt. *Elliottville,* 47 *Maine,* 141; *Darlington* agt. *The Mayor, &c., su pra.*)

In the first of these cases (*Chicago* agt. *Halsey*, 25 *Ill. R.*, 595), it was held by the supreme court of Illinois, that upon a judgment against a municipal corporation the corporate property cannot be seized and sold under execution; that the proper remedy is mandamus to compel a levy of taxes sufficient to enable the corporation to pay the judgment. The superior court of Chicago having refused to set aside an execution issued upon a judgment against the city, the supreme court of the state, upon appeal, reversed the decision of the court below, and directed it to enter an order quashing the execution.

"It is true," says BREESE, J., "that by the charter of the city it can sue and be sued, but it is not an inference that, if sued, and a judgment passes against it, an ordinary writ of *fieri facias* can issue, under which its corporate property can be seized and sold. Nor is there any necessity for such writ. On a debt being ascertained by judgment against a city and a refusal to pay it, a mandamus can issue to compel payment, or to compel a levy of taxes sufficient to discharge the judgment," closing with the remark, "We decide this on principle."

It may be collected, as the result of this examination, that, under an execution upon a judgment against a municipal corporation, the property of the corporation *not devoted to public use*, may be taken and sold to satisfy the judgment; that *if there is no such property*, the remedy is by mandamus, to compel the payment of the judgment out of any money or fund under the corporate control, or to compel the raising of it by tax, when the corporation is clothed with the power to impose a tax; and if it should not be, that then the creditor of the municipal government is placed in the same condition as are the creditors of the state, or of the United States.

Property which is exempt from seizure and sale under an execution, upon grounds of public necessity, must for the

same reason, be equally exempt from the operation of the lien law, unless it appears by the law ·itself, that property of this description was meant to be included.

There is nothing in the lien law that would warrant this inference. A lien is given by the act for labor performed, or materials furnished on the building, altering, or repairing of any house or other building, upon the building and the lot of land upon which it stands, to the extent of the right, title, and interest of the owner at the time when notice of the claim was filed and served. The object of the act was to give mechanics and material men a security for the ultimate enforcement of their claim, by making it from the time that notice of it as provided is given, a lien or incumbrance upon the property benefitted. Where the lien thus attaches, either party may bring the claim to a final determination, and if anything is ascertained to be due to the claimant, judgment is entered for the amount of it, which judgment may be satisfied by the sale of all the right, title and interest, which the owner had to the property when the notice of the claim was filed and served.

When judgment is recovered in a court of record, it is a lien upon the real estate of the defendant, from the time when the lien is docketed; and when recovered in courts not of record, it becomes a lien upon the filing of the judgment in the office of the county clerk. In these cases, it is enforced as a lien only from the time of the docketing of the judgment or the filing of the transcript; but the judgment obtained by foreclosure under the lien law may be enforced as a lien against the particular property from the time of the filing and service of notice of the claim, and that constitutes the particular benefit which it was the design of the act to confer upon the laborer or material man, and is the advantage which it gives him, over ordinary creditors, as a security for the payment of the judgment he may ultimately obtain. With this exception, the judgment

he obtains is, by the express language of the act, "to be enforced in all respects in the same manner as judgments rendered in all other civil actions for the payment of money." (*Laws of N. Y.*, 1851, *p.* 955, § 8). And if judgments recovered in other actions cannot be enforced against a certain kind of property, for the reason that it is exempt from seizure and sale, upon grounds of public necessity, neither can a judgment under the lien law. which is a mere foreclosure of a security obtained by the filing and service of notice of a claim (*Cronkright* agt. *Thomson*, 1 *E. D. Smith*, 661; *Nott's New York Lien Law, p.* 63). And no such security can be obtained upon property, which for reasons of public necessity, cannot be taken and sold to satisfy judgments obtained in ordinary civil actions.

I think the fair construction of the lien law is, that the security contemplated by the law may be obtained upon the building upon which the labor was bestowed or the materials furnished, and upon the lot of land upon which the building stands, if the land and building could be sold to enforce a judgment in an ordinary civil action, but not otherwise. That we are not justified in holding that the legislature meant that this particular kind of creditor should have a lien upon public edifices and the right to sell them to satisfy his claim, unless the legislature has expressly said so. The reason which exempts such structures. upon the grounds of public necessity, applies as forcibly in this case, as in that of any other judgment creditor, and if all other judgment creditors are precluded from the exercise of such a right he must be considered precluded also, in the absence of any provision that would warrant us in holding that the legislature designed that his case should be an exception to the operation of a general rule, having its foundation in public necessity.

The erecting and maintaining of school houses in this city for public education, is imposed as a duty upon the city

by statute. Their erection, maintenance and government is regulated by numerous statutory provisions. They are by law devoted to a public use, and therefore come within the operation of the rule above considered.

Judgment affirmed.

I dissent, G. C. BARRETT, J.